UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHARLES BROWN AND
TRUDY BROWN                                              PLAINTIFFS

VS.                              CIVIL ACTION NO. 3:17CV551TSL-RHW

UNITED STATES OF AMERICA                                  DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

Charles Brown and his wife, Trudy Brown, brought this medical malpractice action against the United States of America under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, for alleged medical malpractice by Dr. Matthew Barchie, an interventional radiologist at Keesler Medical Center, relating to a percutaneous drainage procedure he performed on Mr. Brown in May 2016. After the court granted partial summary judgment to plaintiffs on the issue of Dr. Barchie's breach of the standard of care, the case was tried to the court over five days on the issues of proximate cause and damages. In accordance with Federal Rule of Civil Procedure 52, the court herein makes its findings of fact and conclusions of law on the issue of causation and plaintiffs' claims for noneconomic damages.[1] As explained more fully below,

---

[1]    Rule 52(a)(1) states:
In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

as to these issues, the court finds and concludes that plaintiffs
have established by a preponderance of the evidence that Dr.
Barchie's negligence proximately caused significant, long-term
injuries, for which they are entitled to recover $500,000, the
maximum amount of noneconomic damages allowable under Mississippi
law.  The court at this time reserves ruling on plaintiffs' claims
for past and future economic damages pending further, detailed
briefing by the parties, as requested by plaintiffs, on the issue
of whether TRI-CARE payments, received or anticipated, constitute
a collateral source.[2]

### Course of Treatment of Charles Brown

On October 19, 2015, plaintiff Charles Brown presented at the
Emergency Department at Keesler Medical Center (Keesler) with a
complaint of pain on his side.  He had previously been diagnosed

---

[2]     Plaintiff Charles Brown is eligible for certain health
care benefits under Tricare, a statutory federal entitlement
program that provides health care to members of the armed
services.  The Government maintains that plaintiffs are not
entitled to recover any amounts for medical expenses, past or
future, paid or payable under Charles' Tricare coverage, reasoning
that since Tricare is funded from the federal treasury, payments
under Tricare are not collateral source payments and therefore
should be deducted from any recovery made by plaintiffs.  See
Murphy v. United States, No. CIV. 06-00304 BMK, 2009 WL 454627, at
*6 (D. Haw. Feb. 23, 2009) (observing that "[t]he vast majority of
courts to consider this issue ... have concluded that
TriCare/CHAMPUS benefits are *not* a collateral source, holding that
they are benefits derived from general revenues of the United
States.") (quoting Lawson v. United States, 454 F. Supp. 2d 373,
414 (D. Md. 2006) (emphasis in original)).  Plaintiffs requested
an opportunity to submit additional briefing addressed to this
issue if the court ruled in their favor on the issue of liability.
The court granted their request.

with gallstones, and on this visit, his gallbladder was identified as the source of the problem.  On October 21, 2015, he underwent a laparoscopic cholecystectomy (gallbladder removal).  A week and a half later, Charles began experiencing pain again and returned to Keesler, where it was determined that he had an abscess – an infected collection of fluid – in the gallbladder fossa, the space where the gallbladder had been.  He was admitted and the abscess was successfully drained percutaneously.  Percutaneous abscess drainage uses imaging guidance, such as ultrasound or computed tomography (CT), to place a needle or catheter through the skin into the abscess to drain the infected fluid.  Two days later, he was discharged and returned home.

About six months later, in early May 2016, Charles was again having pain in his side, toward the back.  His pain seemed to improve with stretching but continued to bother him, so on May 8, after church, his wife Trudy suggested they go to Keesler and get it checked out.  A CT scan revealed an intra-abdominal abscess near his liver.  Charles was admitted and administered IV antibiotics.  The following day, he was scheduled for a percutaneous drainage procedure.  The plan at the time was to keep him on antibiotics and to drain the abscess and get a sample to determine what was causing the abscess.

The drainage procedure was performed by Dr. Matthew Barchie. During that procedure, Dr. Barchie became confused as to the

location of the trocar – a hollow cylindrical instrument with a pointed end used to gain access to and insert medical instruments into a body cavity – and inserted it too far. The trocar went through the abscess and diaphragm, transfixed the liver, lung and pericardium and punctured his heart, causing extreme pain.[3] As a result, Charles suffered cardiac tamponade, a condition in which blood (or other fluid) builds up inside the pericardial sac and creates pressure on the heart, preventing it from filling with blood and resulting, in turn, in a reduction in cardiac output and blood flowing to the body's organs. The cardiac tamponade caused a major episode of circulatory/obstructive shock.[4] An emergency sternotomy was performed to remove the blood in order to relieve pressure on his heart[5] and to identify and, if needed, treat any

_____

[3] The Government denies that the trocar actually entered Charles' heart. Although ultimately it is not determinative of anything, the court does find that the trocar probably did puncture his heart. See infra note 6.

[4] Blood carries oxygen to the body's tissues; oxygen, and hence an adequate blood supply, is necessary for the health and survival of tissue. Shock occurs when there is an inadequate flow of blood – perfusion – to the body's tissue and organs. Symptoms of shock include tachycardia (elevated heart rate), hypotension (low blood pressure), diaphoresis (sweating), and cold/pale/clammy skin. Charles was observed to have all these symptoms. Although Dr. Jacob Anderson, a Keesler surgeon who treated Charles, maintained at trial that there was never a lack of adequate tissue/organ perfusion, the court credits the contrary testimony of Dr. Carl Hauser, plaintiffs' medical expert.

[5] In a sternotomy, the sternum is cut in half and pulled apart to provide access to the heart (and lungs).

4

source of bleeding.[6]  During the sternotomy, Charles was found to
also have a hemothorax, a collection of blood in the the pleural
cavity (the space between the chest wall and the lung), which was
evacuated.

After the surgery, Charles was taken to the intensive care
unit (ICU) at Keesler, where he remained until he was discharged
nine days later to a rehabilitation facility.  Throughout his stay
in Keesler's ICU, Charles was extremely frail and debilitated.
For the first couple of days, he remained heavily sedated and in
and out of consciousness.  Within a few days, he became a little
more alert but was confused.  He had difficulty with comprehension
and communication.  He was given physical therapy daily, but his
progress was slow and limited.  On May 17, just one day before his
discharge to the Physical Medicine and Rehabilitation (PMR) unit
at Gulfport Memorial Hospital (Memorial-PMR) for more intensive
rehabilitation services, one of his physical therapists noted that
the goal was for him to be able to tolerate three hours of
physical therapy a day, yet he was "still highly deconditioned"

--------

[6]     Dr. Jacob Anderson, who performed the sternotomy,
testified that he and his surgical team examined Charles' heart
and found no active bleeding or evidence of injury.  However, Dr.
Hauser testified that it is not uncommon to not find the source of
bleeding in these types of events because often, the blood will
have clotted off.  He stated that the 700 milliliters of blood
removed from the pericardium demonstrates that the heart was
penetrated.  Dr. Hauser's testimony was credible and persuasive.

5

and could not tolerate more than thirty minutes of therapy at a time.

Because of the trocar injury that occurred during the May 9 drainage procedure and the consequent emergency sternotomy, Dr. Barchie did not complete the drainage procedure and did not drain the abscess. The plan, according to Dr. Anderson, was thus to continue Charles on antibiotics and "repeat a CT scan before he went to rehab to see if the abscess was still present, assuming he did not show signs of further infection in the interval." And in fact, a CT scan was taken a day or two before his discharge which showed no abscess. Keesler apparently regarded that antibiotics had cleared the infection.[7]

Within hours of his arrival at Memorial-PMR on May 18, Charles was observed to be disoriented and confused. Tests were run which indicated a possible transient ischemic attack (TIA), a sort of mini-stroke, so he was promptly transferred from PMR to the Memorial's Progressive Care Unit (PCU), where he remained for about a week. An EEG taken May 19 showed seizure activity, suggesting his symptoms may have been caused by a seizure rather than a TIA. On day two of his admission, a CT angiogram was ordered because Charles had a cough and congestion. The CT showed a right pleural effusion (a collection of fluid in the pleural

---

[7]     Trudy noted that she was told before leaving Keesler that the infection "had almost disappeared thanks to heavy doses of antibiotics."

6

space), which was thought to be related to the trocar injury.
During thoracentesis to drain the fluid, Charles had a small
pneumothorax (or collapsed lung), which required a pleural tube
(to reinflate), as a result of all of which Charles remained in
the PCU for several additional days in poor condition.  At some
point during this time, a social worker approached Trudy and
inquired whether she had considered hospice care for Charles;
Trudy was horrified at the thought of hospice.

In addition to the pleural effusion, the report on Charles'
May 20 chest CT also showed an "incompletely evaluated" "5.8 cm
mass" of "central low attenuation" on or adjacent to the liver.
The CT report noted, "the mass is amenable to percutaneous tissue
sampling, if needed, following diagnostic thoracentesis".
However, at the time, nothing further was done with respect to
this mass.[8]

On May 27, after a week in PCU, Charles was transferred back
to PMR to start rehabilitation.  At the time, PMR personnel
purportedly anticipated he would complete his rehabilitation in
ten to twelve days and be discharged home, but Charles did not
progress as expected.  It was decided that he needed more care
than PMR could provide and so on June 6, he was transferred to
Greenbriar Nursing Home, a long-term care facility with a more

---

[8]     It is unclear to the court whether this was an abscess
or a phlegmon, or inflammation of soft tissue.

intensive rehabilitation program.  At Greenbriar, Charles made
slow but steady improvement.  After three weeks, on June 27,
although he remained quite frail, he was discharged, to continue
therapy with home care.  He was home for only a few days before he
was again hospitalized for an infection.  During his brief time at
home, he fell twice, and Trudy had to call emergency services for
help getting him up.

On June 28, Trudy drove Charles to Memorial for a previously-
scheduled CT that had been ordered by his oncologist, Dr. Olivia
Hightower.[9]  The June 28 CT scan did not show any cancer, but it
did show what appeared to be an abscess (a "subcapsular fluid
collection along the posterior inferior hepatic margin increased
from prior study").  Dr. Hightower believed this was probably the
abscess that Dr. Barchie had failed to drain.  Charles was thus
admitted to Memorial on June 30, and the next day, he underwent a
percutaneous drainage procedure and was started on a course of IV
antibiotics.  The drain was removed five days later, after a CT
scan taken July 6 showed there was "no residual fluid collection
in the abscess cavity".  A PICC line was placed for continued

_____

        [9]     In 2002, Charles was diagnosed with small cell lung
cancer (SCLC), with liver metastasis.  SCLC is a particularly
aggressive cancer which has a five-year survival rate of only 2%.
Charles was treated initially with chemotherapy, and later, in
2004, underwent prophylactic cranial irradiation, since SCLC will
commonly metastasize to the brain.  Because of his history of
cancer, he underwent regular cancer screenings.  He has been in
complete remission since he completed treatment in or before 2004.

administration of antibiotics,[10] and on July 8, Charles was discharged to Greenbriar to resume rehabilitation, with instructions to return if he developed a fever.[11]

Within a couple of days, the site where the drain was removed began to drain profusely; Charles' antibiotic was changed but the site continued to drain for more than a week. And Charles was weak, "wiped out tired", in Trudy's words. On July 17, four days after his last dose of antibiotics, he had a fever of 101, so he was transported back to Memorial. A CT scan showed the continued presence of a phlegmon – inflammation of soft tissue, usually caused by infection – around his liver but minimal drainage from the abscess. It also showed, though, that he had bilateral deep vein thrombosis (DVT), i.e., blood clots in both legs, probably as a result of his extended immobility.[12] Initially, Charles was given a blood thinner for the DVT, but that was discontinued when a CT scan the following day showed he had developed a small brain

---

[10]    A PICC line is a peripherally inserted central catheter that is inserted into a vein and is typically used for long-term IV antibiotics.

[11]    On that date, Trudy recorded in her notes: "It's 2 calendar months since this all started and we haven't really got anywhere. CB is still too weak to stand alone and still not ready to come home."

[12]    The blood clots of deep vein thrombosis can be caused by anything that prevents the blood from circulating or clotting normally, including limited movement.

bleed.[13]   Instead, IVC filters were placed to prevent clots from
entering his lungs.[14]

Charles was transferred from Memorial back to Greenbriar on
July 27.   During those ten days at Memorial, Charles' condition
was very poor.   As described by Trudy, he was weak and barely got
out of bed.   Most of the time, he was "too shaky to stand".   One
of his treating physicians, Dr. Aultman, noted that his "biggest
problem at this time is debility and decline given his several
months of hospitalization since the spring"; she spoke to Trudy
and told her she should expect a gradual decline in his condition
and suggested to Trudy that she should consider hospice care for
him.   Trudy did not choose hospice.

Charles remained at Greenbriar for the next several months,
with intermittent visits to various hospitals and doctors.
Initially, some days were bad, some were better.   Some days he
could barely stand; others he was able to walk "quite a way" on a
walker, though he was usually exhausted afterward and slept the
rest of the day.   Some days he was more lucid than others.   In
early August, he began having tremors in both hands and his mouth,
which became worse over time.   A neurologist, Dr. Abha Mishra,

---

[13]    Charles had a history of chronic subdural hemotoma
dating to 2014, when he developed a subdural hematoma after being
struck in the head by a suitcase.

[14]    In patients who cannot be given blood thinners, IVC
(inferior vena cava) filters are used to trap blood clots and
prevent them from traveling to the heart and lungs.

thought they could be the result of an anti-anxiety medication he was on; but even after she took him off the medication, his tremors did not improve. However, he did seem to be regaining strength. In her notes, Trudy wrote on August 25 that he had "walked the furthest ever – over 300 ft - all around the interior building + walked again in the afternoon. ... Appears to be getting stronger."

On August 26, Mr. Brown was taken to Merit Health hospital for an abdominal CT scan ordered by Dr. Hightower, who, according to Trudy, wanted to "make sure the abscess on the liver had not returned." The CT showed "a multi-loculated hepatic abscess extending from the right lobe of the liver into the gutter." The abscess that had been drained in July had grown and was extending down to the kidney. The Browns met with Dr. Stephen Johns at Merit Health on September 2 to discuss the CT results, and on September 22, Charles underwent another drainage procedure at Memorial to drain the abscess. A CT at the time showed that a second smaller abscess had formed further down the liver, which was also drained. Charles was again put on antibiotics.

After the September 22 drainage procedure, Charles again returned to Greenbriar, where he briefly resumed therapy. On October 3, he became weak and was running a low grade fever. The next day, his fever spiked, fluid from the drain site changed color and he had was observed to have altered mental status. He

was taken the to emergency department at Memorial and admitted to the PCU. A post-op CT showed "near resolution" of the main/original abscess and a decrease in size of the secondary abscess; but infection was still present. A subsequent CT, taken October 13, similarly showed "decreased size and conspicuity" in the main abscess.

In the meantime, Charles was seen on October 5 by Dr. Jesse Penico, an infectious disease specialist. Dr. Penico concluded that Charles' infection had failed antibiotic and drain therapy and that what he needed was surgery to eliminate the source of the infection, which he thought might be a biliary fistula. Although he did not request a formal consult, Dr. Penico spoke with surgeons at Memorial about performing surgery on Charles, but they declined, on account of Charles' complicated medical picture, struggles with infection, brain bleeds and DVT. Since he was unable to find a local surgeon willing to surgically treat Charles, Dr. Penico referred Charles to Oschner's in New Orleans, hoping for a different response. An appointment was scheduled for November 1. Meanwhile, Charles' condition continued to decline. On October 14, a CT revealed fluid on his brain; burr holes were drilled to relieve the pressure. On October 18, Charles was discharged, not to Greenbriar, but to Select Specialty for specialized nursing care. While at Select Specialty, he was

deconditioned; he was weak, running fevers, and, in general, "looking awful". He was, in Dr. Penico's words, "a mess."

On November 1, Charles was transported to Oschner's via ambulance. CT scans taken at Oschner's showed two abscesses. To Dr. Penico's dismay, doctors at Oscher's did not opt for surgery, as he had hoped, but instead chose to drain them again. While at Oschner's, Charles was found to have dangerously low sodium, which manifested as fatigue, weakness and mental confusion. He remained at Oschner's for over two weeks, while doctors worked to improve his sodium level. He was discharged on November 17 to Select Specialty, where he remained until he was returned to Greenbriar on December 16.

On January 12, Charles was sent back to Memorial, where a CT scan showed the two abdominal abscesses were still present. They were treated with antibiotics and Charles was discharged back to Greenbriar on January 30. By that time, Dr. Penico had reached out to Dr. Douglas Slakey, head of the surgery department at Tulane Medical Center, for a surgical consultation, and an appointment had been scheduled for February 8.

After reviewing Charles' medical records and CT scans, Dr. Slakey suspected that his abscess was caused by retained gallstones, given the location of the abscess, the fact that Charles had experienced the first abscess just ten days after the

cholesystectomy and the fact that the abscess was recurring.[15]  He
concluded that although Charles was "somewhat frail due to
longstanding illness [with] risk factors of chronic illness and
associated deconditioning as well as a history of deep venous
thrombosis and intracranial hemorrhage", open surgery to drain the
abscess and remove any retained gallstones was the best and most
likely effective treatment.

Surgery was initially scheduled for February 16, 2017, but
had to be rescheduled because on February 14, Charles experienced
another brain bleed.[16]  It was subsequently rescheduled for and
took place on April 25, 2017.[17]  At that time, Dr. Slakey drained
the abscess and also removed most of the lowest right rib because
the rib appeared to him "to be intimately involved with the
infectious process".[18]  Dr. Slakey also removed from the abscess

_____

[15]     It is not uncommon and is usually harmless for
gallstones to be spilled during a laparoscopic cholecystectomy.
However, in rare cases, spilled or retained gallstones, especially
if infected, can cause abdominal infections/abscesses.

[16]     It was a small brain bleed that resolved without any
intervention.

[17]     Charles went for his pre-op evaluation on April 18 and
was sent to Tulane's emergency department because he was agitated,
having problems remembering time and place and complaining of
chest pains.  He was admitted.  An MRI of the brain showed an
acute or chronic subdural hemotoma.  It resolved and he was
discharged on April 20.

[18]     The rib was soft and had a spongy feel to it, leading
Dr. Slakey to conclude it was infected.  An infection of the bone
– osteomyelitis – can be caused in a number of ways, including by
bacteria deposited by medical instruments inserted in the body

14

cavity several small stones that he believed were gallstones that had been dropped during the cholecystectomy.

Two days after surgery, Charles was discharged and returned to Greenbriar.  Within days of his discharge, however, he experienced redness and swelling at the site of his surgical incision.  Dr. Penico ordered a PICC line and broad-spectrum antibiotics, but when Charles presented at Merit the next day for placement of the PICC line, he was hypotensive, extremely weak, confused and slow in his responses.  He was diagnosed with severe sepsis and septic shock[19] and admitted to the ICU.  He recovered, and five days later, was discharged, once again, to Greenbriar. He remained at Greenbriar for another two and a half months of convalescing and receiving physical, occupational and speech therapy.

On July 26, 2017, Charles was finally able to return home, though he was still in a weakened condition and required outpatient/home rehabilitation services and assistance with activities of daily living.  Because of his weakness and balance issues, he has had a number of falls, some resulting in trips to

that come in contact with the bone.  While bones are typically resistant to infection, a person whose immune system is compromised has a greater risk of osteomyelitis.

[19]    When sepsis is untreated or occurs in a person with a weak immune system, it can spread throughout the body and cause septic shock, a life-threatening condition requiring immediate medical treatment.

the emergency room.  Moreover, in December 2017, he developed an
eye infection that tested positive for methicillin-resistant
Staphylococcus aureus (MRSA), a type of staph bacteria that is
difficult to treat because it is resistant to many of the
commonly-used antibiotics.  As a result, his rehabilitative
therapies had to be stopped for several months.  In addition, he
developed chronic cellulitis, a painful bacterial skin infection,
in both lower legs that required several months of sustained
treatment.

Charles remains significantly debilitated.  He requires
assistance with most activities of daily living.  He can walk, but
only short distances and only with the aid of a walker.  When he
leaves the house for any purpose, he relies on a wheelchair to get
around.  He can tend to his own toileting needs but requires
assistance with bathing/showering.  Depending on the clothing, he
can dress himself, though he needs help with buttons.  He cannot
cook, clean, or mow the lawn.  He cannot drive and, because he
needs regular assistance and is at a high risk for falls, he
cannot be left alone.

### Applicable Law

The FTCA authorizes suits for damages against the United
States for personal injury or death caused by a government
employee's negligence "under circumstances in which a private
person would be liable under the law of the state in which the

negligent act or omission occurred." Hannah v. United States, 523 F.3d 597, 601 (5th Cir. 2008) (citing 28 U.S.C. §§ 1346(b)(1), 2674). State law controls liability for medical malpractice claims under the FTCA; the court thus looks to Mississippi law for the elements of plaintiffs' claims. Coleman v. United States, 912 F.3d 824, 829 (5th Cir. 2019).

Under Mississippi law, to establish a *prima facie* case of medical malpractice, a plaintiff must prove the following elements: "(1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant." Estate of Sanders v. United States, 736 F.3d 430, 435–36 (5th Cir. 2013) (quoting Hubbard v. Wansley, 954 So.2d 951, 956–57 (Miss. 2007)). The court previously ruled via summary judgment that in performing the drainage procedure on May 9, 2016, Dr. Barchie breached the applicable standard of care by failing to know where the tip of the trocar was at all times and as a result, inserting the trocar through the abscess, through the liver and the diaphragm and into the thoracic cavity, where it punctured the lung, pericardium and heart. Based on the record evidence, there is no doubt that Dr. Barchie's negligence proximately caused injury to Charles. As a direct result of the trocar entering the

pericardium and puncturing Charles' heart, he experienced severe pain, reportedly a "10" on a scale of 1 to 10; he required an emergency sternotomy, major surgery that would not have been necessary but for the trocar injury; and he was hospitalized in the ICU, bedridden, for more than a week, which also would not have occurred but for Dr. Barchie's negligence.  Further, even under the best of circumstances, recovery from a sternotomy requires a period of rehabilitation/physical therapy; Charles' were not the best of circumstances.  None of this is controverted.[20]  There is, however, a significant dispute between the parties as to the extent of injury proximately caused by Dr. Barchie's negligence.  Plaintiffs maintain that the long-term deconditioning and debility and associated medical problems Charles has experienced were proximately caused by the May 9, 2016 botched drainage procedure and the resulting shock and sternotomy, while the Government contends that his problems were the result, not of the trocar injury, but rather the recurrent abdominal abscesses he had for nearly a year following his discharge from Keesler.  This dispute was the principal focus of evidence at trial.

---

[20]    The Government does not agree that Dr. Barchie breached the standard of care and opposed plaintiffs' motion for summary judgment on that issue.  However, the Government does not deny that if Dr. Barchie did breach the standard of care, then Dr. Barchie's negligence resulted in at least some injury to Charles.

Proximate cause is comprised of cause-in-fact and foreseeability. City of Jackson v. Thornton, 94 So. 3d 1186, 1194 (Miss. Ct. App. 2011) (citation omitted). An act or omission is a "cause in fact" if it was "a substantial factor in bringing about the injury, and without it the harm would not have occurred." Id. (quoting Ogburn v. City of Wiggins, 919 So. 2d 85, 91 (Miss. Ct. App. 2005)). "'Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others.'" Id. at 1194-95 (quoting Ogburn, 919 So. 2d at 92).

Plaintiffs are not required to prove causation with certainty but rather to a degree of reasonable medical probability. Norman v. Anderson Reg'l Med. Ctr., 262 So. 3d 520, 524 (Miss. 2019) (citing Clayton v. Thompson, 475 So. 2d 439, 445 (Miss. 1985)). That is, they must present evidence which establishes to a reasonable medical probability that their alleged injuries were caused by the defendant, i.e., to show that it is more likely than not that the defendant's negligence caused the harm or condition for which they seek relief. See The Univ. of Mississippi Med. Ctr. v. Littleton, 213 So. 3d 525, 535-36 (Miss. Ct. App. 2016) ("For the proximate-cause element, the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation

is not enough.") (internal quotation marks and citation omitted).[21]

<u>Findings of Fact</u>:

The court makes the following findings of fact.

<u>Causation</u>:

The court has carefully considered all the evidence and the parties' arguments, and finds that the trocar injury Charles sustained on May 9, 2016 was a substantial factor in causing his

---

[21]     Where a plaintiff alleges that his medical provider "failed to administer proper care and that the failure allowed an already existing injury to deteriorate," that is, in a lost-chance-of-recovery case, to establish proximate cause, "the plaintiff must prove that had proper care been administered then it is probable, or more likely than not, that a substantially better outcome would have resulted." <u>Griffin v. N. Mississippi Med. Ctr.</u>, 66 So. 3d 670, 673 (Miss. Ct. App. 2011) (citation omitted). "Stated differently, the plaintiff must show that, absent malpractice, there is a greater than fifty-percent chance that a substantially better result would have followed." <u>Id</u>. If plaintiffs had sued Dr. Barchie because of his failure to drain the abscess, this would be the applicable standard; but that is not the basis of their claim. Rather, they have sued Dr. Barchie because, in the course of attempting to drain the abscess, he negligently injured Mr. Brown by inserting the trocar too far and puncturing Mr. Brown's liver, lung, pericardium and heart. Accordingly, this is not a lost-chance-of-recovery case. <u>See</u> <u>Estate of Sanders v. United States</u>, 736 F.3d 430, 437 (5th Cir. 2013) (citation omitted) (in so-called "loss of chance" cases, "where the injury resulted from an underlying disease and the alleged malpractice took the form of a failure to cure, rather than the results of 'any positive effects of mistreatment,'" the plaintiff must prove that it was probable, or more likely than not, that the patient would have been helped by proper treatment); <u>Carrano v. Yale-New Haven Hosp.</u>, 279 Conn. 622, 660, 904 A.2d 149, 175 (2006) (claim that improper provision of medical treatment affirmatively caused death of decedent was not loss of chance claim as it was based on affirmative act causing harm rather than a negligent failure to act). Even if it were, however, the court would find the plaintiffs had sustained their burden to prove causation. <u>See</u> *infra* p.p. 20-22.

extreme and long-term debility and associated medical problems
that continue to plague him to this day.  Charles walked into
Keesler on May 8 a vigorous, independent individual with an
abdominal abscess that for a couple of weeks had caused him some
relatively minor pain and discomfort.  In the court's opinion, it
is likely that, but for the trocar injury, the abscess would have
been drained – apparently successfully – and in a couple of days,
Charles would have recovered and returned to his home and to his
life as it was.  However, because the abscess was likely caused by
retained gallstones from his earlier cholecystectomy, the abscess
would have recurred and begun causing him pain and discomfort,
though probably not until some weeks or months later.  When it
did, he would have gone back to Keesler.  At that point, his
doctors might have begun to suspect he had retained gallstones and
opted to go ahead and perform surgery to remove them, in which
case he would have been discharged within several days and
returned home to his life, fully recovered.  Alternatively, they
might have decided to try another drainage procedure, which would
again have seemed successful, at least initially; but because the
source of the infection had not been removed, the abscess would
have recurred.  And when it did, his doctors at Keesler likely
would have performed surgery and found and removed the retained
gallstones, and he would have returned home in a matter of days,

with no adverse sequella.  The evidence suggests that this is the course of events that would reasonably have been expected.

This entire scenario, however, is necessarily hypothetical, because the May 9 drainage procedure attempted by Dr. Barchie did not go as expected.  Instead, through his negligence, Charles suffered a traumatic injury, causing shock and resulting in an emergency sternotomy, with resulting complications from which he has not and will never fully recover.

Dr. Hauser, plaintiffs' medical expert who specializes in critical care, opined that the injury and resulting shock "elicited a SIRS response, or a systemic inflammatory response," which led to "persistent inflammation, immunosuppression, and catabolism syndrome," or "PICS", a recently-observed syndrome in which people with major injuries or major inflammatory events go on to be sick for extended periods of time, and "seem to never get getter."  They have catabolism, i.e., protein muscle breakdown/wasting, causing severe weakness and debility.  And they have a tendency to get repeated bouts of infection because they have an immunosuppression.

Inflammation is the immune system's response to an inflammatory event, such as infection or trauma.  SIRS occurs when there is systemic inflammation, i.e., throughout the body.  SIRS can be caused by infection (in which case it is sepsis) or by trauma; it can manifest, for example, by a rapid heart rate, rapid

breathing, low blood pressure and/or fever. Persistent SIRS, as explained by Dr. Hauser, can lead to persistent inflammation and immunosuppression and catabolism, which is what he maintains occurred in Charles' case. Dr. Hauser testified that as a result of the trocar injury, Charles had significant, prolonged SIRS which led to PICs, so that he had prolonged critical illness which became self-sustaining; he got sick and just stayed "sick and sick and sick." Dr. Hauser expressed certainty that the trocar injury caused generalized immunosuppression, and opined that his debility was the result of the catabolism aspect of the PICS. In short, what happened, according to Dr. Hauser, was that Charles experienced the trocar injury, shock and resulting sternotomy, and then, as a direct result,

> He then had a period of prolonged critical illness during which he never really got better and never got well enough to handle his underlying infection. He also still had the infection in the subphrenic space which had not been drained.
> So he had all of those things, and he never really got well enough to be cared for them more aggressively.

In the court's opinion, it is manifest from the evidence that the abscess Charles presented with on May 8, 2016 was not the cause of the immediate and precipitous decline and the persistent debility he experienced in the weeks immediately following the botched drainage procedure and resulting sternotomy. The obvious cause of this decline and debility was the trocar injury. Indeed, when he was discharged from Keesler, Keesler considered that the

abscess was nearly gone, and yet Charles was too weak even to
stand on his own.[22]  The infection could not have been the cause of
his debility at that point.

The infection/abscess did return, of course.  However, the
court is persuaded from the evidence, including Dr. Hauser's
testimony, that Charles, owing principally to the trocar injury,
was immunosuppressed, and as a result, the infections/abscesses he
experienced following his discharge from Keesler developed more
rapidly, were more severe, caused complications that were not
otherwise likely and, consequently, were more difficult to treat
appropriately and effectively.  The court does believe, contrary
to Dr. Hauser's view, that retained gallstones were the likely
source of Charles' abscesses,[23] and therefore, as Drs. Slakey,

_____

[22]     Dr. Shannon Orr, the government's medical expert, was
under the impression that when Charles left Keesler, he "was
walking about three hours a day with physical therapy".  Charles
was not "walking three hours a day" when he left Keesler; he was
barely standing for even a minute, and even then, required
assistance.  Given Charles' actual condition, he could not
reasonably have been expected to have recovered sufficiently to
return home in under two weeks.

[23]     Dr. Hauser was dubious of this.  He pointed out that
retained gallstones rarely cause complications, and he noted that
the lab results on the material removed by Dr. Slakey did not
contain evidence of bilirubinate matter.  He suggested that what
may have appeared to Dr. Slakey to be gallstones could have been
any number of other things, such as dead bone or other debris.
However, Dr. Slakey, a highly-regarded surgeon, was not equivocal
in his testimony that during the surgery to remove the abscess, he
removed what he was able to affirmatively identify as gallstones.
The court credits his testimony.
     Dr. Slakey also removed part of an infected rib during the
surgery which several witnesses, including Dr. Hauser, agreed

24

Penico and Dr. Shannon Orr (the Government's medical expert) agreed, he would have continued to experience abscesses/infection until the retained gallstones were removed. That is, even had the trocar injury never occurred, Charles would have continued to develop abdominal abscesses on account of the retained gallstones. But in the court's opinion, while long-term infection can cause debility and a variety of medical problems, it is unlikely Charles would have experienced the debility and medical complications he suffered had it not been for the trocar injury.[24] His unrelenting infections no doubt contributed to his debility and associated

_____

could have been the source or a source of the recurrent abscesses. No witness could state definitively how or when the rib became infected. It could have been at the time of the May 9 drainage procedure or during some other drainage procedure, as the result of contact between the rib and a medical instrument carrying bacteria; or it could have occurred in some other way. There is no way to know. The witnesses agreed, though, that to prevent further infection, the rib had to be removed; and this could only be done surgically.

[24] Dr. Penico testified that a patient with a normal immune system would have problems with infected retained gallstones but that "it's more severe in people who can't fight it off", i.e., who are immunosuppressed.

medical problems,[25] but in the court's opinion, they were not the

proximate cause.[26]

### Noneconomic Damages

Under Mississippi law, in addition to recovery for their

economic loss, plaintiffs in an action for injury based on

---

[25]   The Government points out that Charles had a number of
preexisting conditions, including COPD, tremors, seizures or
seizure-like activity, subdural hematoma, osteoarthritis, shingles
and cancer, and appears to suggest that some or all of these may
have contributed to his debility.  However, while one or more of
these conditions may have required medical treatment and may have
complicated his recovery, none can reasonably be found to have
proximately contributed to his long-term debility.

[26]   The Government has insinuated that Charles' infection
from retained gallstones persisted as long as it did because the
parade of doctors who treated him after he left Keesler failed to
provide timely and appropriate treatment.  It has suggested, for
example, that (1) doctors should have investigated and treated
what appeared on a May 20, 2016 CT scan as a possible abscess, as
a result of which the abscess went untreated for more than six
weeks; and (2) doctors should have recognized far sooner that
surgery was needed to remove the underlying source of the
infection.
On a pretrial motion by plaintiffs, the court ruled that
since the Government did not raise allocation of fault as an
affirmative defense, then it was precluded from presenting
evidence that Charles' care following his discharge from Keesler
was mismanaged.  Even if evidence did show that Charles' care was
mismanaged and that his condition would have improved sooner had
the abscess been treated more timely and effectively, i.e., by
surgical intervention, that would not absolve the Government of
liability.  There are circumstances in which negligence by third
parties may constitute an intervening cause that will break the
chain of causation.  See Causey v. Sanders, 998 So. 2d 393, 405
(Miss. 2008).  Even if the facts supported application of this
defense – they do not-- the Government has not raised this
defense, and in fact, has repeatedly denied that it seeks to prove
negligence on the part of Charles' other medical providers.

malpractice or breach of standard of care against a provider of

health care, may recover noneconomic damages

> arising from death, pain, suffering, inconvenience,
> mental anguish, worry, emotional distress, loss of
> society and companionship, loss of consortium, bystander
> injury, physical impairment, disfigurement, injury to
> reputation, humiliation, embarrassment, loss of the
> enjoyment of life, hedonic damages, other nonpecuniary
> damages, and any other theory of damages such as fear of
> loss, illness or injury.

Miss. Code Ann. § 11-1-60(1)(a).  However, by statute, plaintiffs

(collectively) may not be awarded more than $500,000.00 for

noneconomic damages.  See Miss. Code. Ann. § 11-1-60 (establishing

$500,000 cap on noneconomic damages); cf. Estate of Klaus ex rel.

Klaus v. Vicksburg Healthcare, LLC, 972 So. 2d 555, 559 (Miss.

2007) (in wrongful death action, interpreting statute capping such

damages to mean that "the plaintiffs" – plural, not singular –

shall not be awarded more than $500,000 for noneconomic damages).

In the case at bar, the court, if permitted, would award each

plaintiff noneconomic damages of at least $500,000, but concludes

that it is limited to awarding plaintiffs, collectively, $500,000.

As a result of his injuries, Charles spent more than a year of his

life in hospitals and long-term care facilities.  He can no longer

golf, mow the lawn, sing in the choir – all the things that used

to bring him enjoyment.  He cannot drive; he cannot walk, bathe or

dress without assistance; he cannot be left alone.  He has lost

his independence.  In Trudy's words, "His world has shrunk.  It's

now about when to take medicine, when to have a doctor's appointment...." His situation may improve, but not dramatically.

As for Trudy, for several years now, she has been relegated to the role of full-time care-giver. More than once during their ordeal, when Charles was at his worst, she was confronted with the very real prospect of Charles' death; hospice was recommended. Trudy retired with plans of traveling with and enjoying time spent with her husband. She cannot even have an in-depth conversation with him anymore. As she put it, "I've lost all of that. I've lost my favorite person, you know, my traveling companion, my husband of 46 years. I never thought it would be like this."

Conclusions of Law

The court concludes that Charles and Trudy Brown have sustained significant injuries proximately caused by the negligent acts or omissions of Dr. Matthew Barchie, an employee of the United States of America acting within the scope of his employment, under circumstances where the United States of America, if a private person, would be liable to plaintiffs under the laws of the state of Mississippi. Judgment will be entered for plaintiffs in an amount to be determined after the parties have had an opportunity to fully brief the Tricare issue identified in footnote 1. Plaintiffs shall have fourteen days from this date within which to submit their memorandum addressing

that issue, following which the Government, if it chooses, may submit a rebuttal memorandum within seven days thereafter.[27]

SO ORDERED this 26th day of November, 2019.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[27] The Government addressed the Tricare issue in its proposed findings and conclusions of law.  Plaintiffs did not.