UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


CHARLES BROWN AND
TRUDY BROWN                                      PLAINTIFFS

VS.                          CIVIL ACTION NO. 3:17CV551TSL-RHW

UNITED STATES OF AMERICA                          DEFENDANT


## MEMORANDUM OPINION AND ORDER

On November 26, 2019, following a bench trial of
plaintiffs' medical negligence claim under the Federal Tort
Claims Act (FTCA), 28 U.S.C. § 1346(b), 2671 *et seq.,* this court
entered its memorandum opinion and order finding that Charles
Brown sustained an injury on May 9, 2016 as the direct result of
the medical negligence of Dr. Matthew Barchie, a physician
employed by the United States; that as a proximate result of
that injury, Mr. Brown required an emergency sternotomy; that as
a result of the injury and resulting sternotomy, he was severely
debilitated and immunosuppressed, as a result of which he
experienced recurrent infections, resulting in prolonged
critical illness and consequent long-term debility; and that as
a result of all of this, he is now and will remain in a
vulnerable medical condition and debilitated and will never
return to self-sufficiency with respect to his activities of
daily living.  The court concluded that plaintiffs, Charles and

his wife Trudy, should recover the maximum amount of nonecomonic damages available to them under Mississippi law, which is, collectively, $500,000. The court reserved ruling on Mr. Brown's economic damages pending further briefing by the parties. That briefing is now complete.[1]

### Past Economic Damages

Plaintiffs have presented evidence of Mr. Brown's medical expenses totaling $2,082,592.10 from the time of his injury to the time of trial. In the court's opinion, these expenses are for medical care and treatment proximately related to his May 9, 2016 trocar injury from Dr. Barchie's negligence.[2]

In addition to an award of these medical expenses, plaintiffs seek an award of damages for three years of attendant care provided by Mrs. Brown to her husband from the time of his injury to the time of trial. As Mr. Brown remained hospitalized or in a long-term care facility continuously for more than a year following his injury, he had no need for attendant care

---

[1] "[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law." Molzof v. United States, 502 U.S. 301, 305 (1992) (citations omitted). Thus, Mississippi law applies to the issues addressed herein.

[2] The Government contends it is entitled to a setoff against Mr. Brown's past economic damages, as well as his future economic damages, for amounts covered and paid by Tricare, an insurance program in which Mr. Brown was enrolled by virtue of his status as former member of the military. The Government's argument regarding its claim for a setoff is addressed *infra* at 23-32.

during that period.  However, he did continue to require
substantial assistance with his activities of daily living after
he was finally discharged to the parties' home in July 2017;
Mrs. Brown provided that assistance.  And he could not be left
alone; he needed someone with him at all times, and Mrs. Brown
was that person.  Plaintiffs submit that had Mrs. Brown not
provided these necessary services, then someone would have had
to be paid for them, at the cost of approximately $20 per hour,
for the 16 hours per day that such services were needed.

In the court's opinion, an award of damages is clearly
appropriate for the attendant care Mrs. Brown has provided.  The
court finds, though, that such care was reasonably required, not
for the 16 hours a day claimed by plaintiffs but instead for
eight hours a day, during which time Mrs. Brown could take care
of Mr. Brown's medicine, bathing needs, assist him with
dressing, and provide transportation as required and assist him
with or tend to other needs that may have arisen.  The
Government has not contended the hourly rate sought by
plaintiffs for such care is unreasonable or offered evidence of
a different rate.  Accordingly, the court will award $113,120
for past attendant care.

Future Economic Damages

As a proximate result of the trocar injury suffered by Mr.
Brown, he will incur reasonable and necessary future medical

expenses and costs associated with attendant care for the remainder of his life. Plaintiffs contend the costs of Mr. Brown's future medical care and attendant care, assuming in-home care for his projected life expectancy of 14.98 years, will be between $3,013,643 and $4,247,925. In support of these figures, plaintiffs have offered a report and life care plan prepared by Kathy Smith, a certified life care planner, which includes projected costs for case management evaluation/services; financial planning evaluation/services; attendant care; housekeeping and handyman services; various evaluations and therapeutic modalities, including physical and occupational therapy, neurotherapy/vestibular and speech therapy; nutritional and dietary evaluation/services; skin trauma evaluation and supplies; medical care; medications; durable medical equipment (wheelchair, walker, chair lift, shower chair, medical bed, bedside commode), including accessories and routine maintenance; supplies, including for incontinence; adaptive clothing; annual technology evaluations; home renovations; a home security access and emergency alert system; wellness center membership; and several other miscellaneous items.

For its part, the Government disputes plaintiffs' assertion of a 14.98-year life expectancy for Mr. Brown and has offered the opinion of its retained expert, Robert Shavelle, that his probable life expectancy is five to six years. The Government

further argues that Smith's life care plan and testimony based thereon are unreliable because the majority of what Smith identifies as future medical expenses are unsupported by medical documentation demonstrating the items are medically necessary or that the need for such items is the proximate result of the injury sustained by Mr. Brown due to Dr. Barchie's negligence.

Life Expectancy

A principal point of contention between the parties is Mr. Brown's probable life expectancy.  Smith testified that in developing her life care plan for Mr. Brown, she used the actuarial life tables put out by the Office of the Chief Actuary of the United States Social Security Administration (SSA), which give average life expectancies for persons in the United States based on age and gender.  At the time she created the life care plan, Mr. Brown was 69 years old.  According to the SSA tables, the average life expectancy of a 69-year-old male in the United States is 14.98 years.  This average, however, is the life expectancy of "an average person in normal health".  Pharr v. Anderson, 436 So. 2d 1357, 1360 (Miss. 1983).  While such tables may be helpful and provide some guidance in evaluating an individual's probable life expectancy, as courts have often noted, evidence as to the health condition of a particular individual may suggest a reduced life expectancy and is properly considered.  See id. (holding that, where plaintiff was a

diabetic and in ill health, "appellant had the right to show [the plaintiff's] physical condition and that she was not a healthy person"); Carroll v. Morgan, 17 F.3d 787, 791 (5th Cir. 1994) (holding that defendant "was entitled to show that Carroll was not a healthy person and that his intemperance might have resulted in a reduced life expectancy"); Kershaw v. Sterling Drug, Inc., 415 F.2d 1009, 1012 (5th Cir. 1969) (stating that "[a]ppellant was … free to argue that such tables are based on average life expectancies and the jury may consider any conditions of health which might cause appellee not to equal the average."); Settles v. United States, No. 5:17-CV-1272, 2019 WL 2565264, at *4 (W.D. Tex. May 3, 2019) (holding that expert would be "permitted to testify generally about how comorbidities reduce life expectancy and … about the average reductions in life expectancy stemming from comorbidities"); cf. Luwisch v. Am. Marine Corp. , No. 19-30499, 2020 WL 1873213, at *5 (5th Cir. Apr. 15, 2020) (in determining work life expectancy, court may consider "evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average.") (quotation omitted). Mr. Brown obviously is not a healthy person or a person of average health. His life expectancy is therefore

likely to be shorter than the average.[3]  The question is, how
much shorter.

In contrast to Smith's reliance on the SSA life tables, the
Government's life expectancy expert, Robert Shavelle, used
various life expectancy calculators or indices – the Schonberg,
Lee/Cruz and Suemoto indices - to arrive at an opinion that Mr.
Brown, at age 69, had a life expectancy of five to six years.
To use these calculators, the user inputs the age and gender of
the individual at issue, and responds to a number of questions
about the individual's medical history, e.g., whether he has

---

[3]     The court acknowledges plaintiffs' arguments that the life
expectancy tables should be used to establish life expectancy in
the absence of competent and reliable evidence that an
individual, because of his health or otherwise, falls outside
the statistical averages.  They submit that such proof is
lacking in this case, and argue, more particularly, that the
opinion of the government's life expectancy expert, Robert
Shavelle, who "has no formal medical education, is not a medical
doctor, and admits that he is not qualified to provide testimony
as to Mr. Brown's current disabilities, … is not sufficient to
warrant deviating from the United States' life expectancy
tables."  The court, however, can readily determine for itself,
without reference to Dr. Shavelle's opinion, that Mr. Brown is
not a person of average health.  If plaintiffs believed that
were true, they presumably would not be requesting millions of
dollars for his future care, including 24/7 attendant care.
Plaintiffs cannot have it both ways.
    Moreover, the court is not persuaded that the testimony of
Dr. Rebecca Rose, Mr. Brown's primary treating physician who is
familiar with his medical condition and limitations, supports
reliance on the SSA tables as establishing Mr. Brown's life
expectancy.  While she did cite the life expectancy tables as
the basis for giving a 14.98-year life expectancy, Dr. Rose
testified that she had never before used the life expectancy
tables and had no prior familiarity with them.

been diagnosed with diabetes, heart disease, lung disease,

cancer; his smoking status, i.e., never, former or current; his

overall health condition, i.e., excellent, good, fair, poor; and

limitations due to his current mental/physical conditions, e.g.,

difficulty walking distances, bathing, handling finances.  A

score calculated on the basis of the information entered

correlates to the risk of mortality at given points in time.

For example, the Shonberg calculator provides five- and nine-

year mortality risks; the Lee index, the mortality risk at five

and ten years; and Suemoto gives a ten-year risk.[4]

---

[4]    Dr. Shavelle testified that in addition to his use of these
life expectancy calculators, he also sought to verify his
opinion using the Rankin/modified Rankin scale, a tool used to
measure the severity of a stroke, and a study of the effects of
traumatic brain injury (TBI) on life expectancy, explaining that
he noted from the medical records that Mr. Brown had suffered a
stroke and a TBI.  However, the medical evidence does not
reflect that Mr. Brown had a TBI and is highly questionable as
to whether he had a stroke.  Ultimately, Dr. Shavelle maintained
he was merely attempting to account for the extent of Mr.
Brown's debility on his life expectancy; the cause of the
debility, i.e., stroke or TBI, he said, was not a relevant
consideration, only the extent.  Dr. Shavelle was unaware that
the cause of Mr. Brown's debility, and the extent thereof, was
the injury that is the subject of this litigation.  In the
court's opinion, he has not adequately demonstrated that this
evidence has relevance beyond the specific context of debility
caused by stroke or TBI.
     The court would note further that several of the factors in
the Shonberg/Lee and Suemoto calculators represent an attempt to
gauge the effect of a person's physical or mental limitations on
his life expectancy, also without regard to the cause of such
limitations.  In Mr. Brown's case, it appears that the extent of
his debility and resulting limitations probably is the greatest
negative factor bearing on his life expectancy.  The years he
has lost, however, are not a compensable economic loss.

Plaintiffs have criticized Dr. Shavelle's use of these calculators, claiming that the results he obtained were inaccurate, on the low end, because the information he input about Mr. Brown was inaccurate. Specifically, they contend that it would have been more accurate to classify Mr. Brown as a "never smoker" rather than a "former smoker" since he has been a non-smoker since his mid-30s; and they assert that his history of cancer should not have been a factor in evaluating his life expectancy, since, against considerable odds, he survived the cancer and has been cancer-free for more than a decade.

In his expert report, Dr. Shavelle stated that "[i]n some cases, the medical literature specifies how … excess (mortality) risk changes over the lifetime. For example, patients with … cancer have a very large [excess death rate] during the first few post-onset years, but these may gradually diminish." Dr. Shavelle maintained that the life expectancy calculators he used correlate to the scientific data concerning such matters as the effect of a person's history of smoking or cancer on life expectancy; but, he said, they are based on averages and are "not nearly as fine tuned". In the court's opinion, it makes sense that in using these calculators, the court is warranted in attempting to "finely tune" the result, for example, by taking into account, to the extent it is reasonably able to do so, whether Mr. Brown is likely the average former smoker or is

better or worse off than the average former smoker, and whether he is the average cancer survivor or is better or worse off than the average cancer survivor.

Mr. Brown turned 70 in December 2018, five months before trial. Thus, he is in the low end of the 70-74 age category in the various life expectancy calculators cited by Dr. Shavelle.[5] He is a former smoker, but he quit smoking at the age of 36. Medical literature presented by plaintiffs' expert epidemiologist, Michael Freeman -- which Dr. Shavelle did not dispute -- supports plaintiffs' position that although smokers who begin smoking in early adult life and continue smoking die on average ten years younger than lifelong non-smokers, smoking "cessation at age 60, 50, 40, or 30 years gain[s], respectively, about 3, 6, 9, or 10 years of life expectancy."[6] It follows that Mr. Brown's remote history of smoking should have little effect on his life expectancy. Dr. Shavelle likewise did not dispute

_____

[5]     As Dr. Shavelle noted, all of the calculators he used are interactive and available online for anyone to use at eprognosis.com.
[6]     The United States Centers for Disease Control similarly reports that "[q]uitting smoking before the age of 40 reduces the risk of dying from smoking-related disease by about 90%." https://www.cdc.gov/tobacco/data_statistics/fact_sheets/health_effects/tobacco_related_mortality/index.htm (citing P, Ramasundarahettige C, Landsman V, Rostrom B, Thun M, Anderson RN, McAfee T, Peto R. 21st Century Hazards of Smoking and Benefits of Cessation in the United States [PDF-738 KB]external icon. New England Journal of Medicine, 2013;368(4):341-50 [accessed 2015 Aug 17]).

the testimony of plaintiffs' expert, based on data from the National Cancer Institute, that once a patient has survived small cell lung cancer for as long as Mr. Brown has, the cancer no longer increases the chance that he is going to die earlier; it is "no longer a factor" in his mortality. Thus, while Mr. Brown has a history of cancer, that history should have little, if any, actual bearing on his life expectancy.[7]

The result, using the Suemoto index and inputting accurate responses, i.e., a 70-74 year-old male, former smoker with chronic lung disease, no current cancer, and having Mr. Brown's current level of debility, gives a 10-year mortality rate of 63%. Changing one variable, age, from 70-74 to 64-69, significantly lowers the resulting mortality risk, to 46%. Reason would suggest that a man who has only recently turned 70, as Mr. Brown had at the time of trial, would have a ten-year mortality rate greater than 46% but less than 63%. Changing one

---

[7]    The Government moved pretrial to exclude the report and testimony of Michael Freeman pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In the court's opinion, he was qualified to testify as an epidemiologist. And, the only testimony he offered which the court has considered in rendering its decision was as to the effects of smoking cessation on mortality and the diminished relevance of a history of small cell lung cancer after 16 years. The accuracy of this specific testimony was not disputed but rather acknowledged by Dr. Shavelle. The motion to strike, therefore, will be denied.

other variable, from a "former smoker" to a "never smoker",
lowers the ten-year mortality risk further, to 41%.
Taking into account that Mr. Brown, while a former smoker, had
quit smoking at an early enough age to avoid nearly all the
negative effects of smoking on mortality, his ten-year mortality
risk, based on this index, probably would not exceed 50%.

Using a combined Lee/Schonberg index, which appears to be a
combination of two of the calculators used by Dr. Shavelle, a
male aged 70 to 74, in poor to fair health, with Mr. Brown's
current debility/limitations, who is a former smoker with a
chronic lung disease and a history of cancer, would have a score
on the Schonberg scale of 13, giving him a five-year mortality
risk of 37-41% and a nine-year mortality risk of 60%-68%.  With
these same factors, the Lee index would yield a score of 10,
which correlates to a five-year risk of 28%-45% and a ten-year
risk of 52%-58%.  However, under these indices, if he were a
"never smoker" who had no history of lung cancer, his five-year
mortality risk on the Schonberg index would be 17%-27%, and on
the Lee scale, 9%-15%.  On the Schonberg index, his nine-year
mortality risk would be 37%-44%, and on the Lee index, his ten-
year risk would be 34%-43%.  The court does not suggest that Mr.
Brown could be fairly characterized as a "never smoker" or as
having never had cancer.  However, the medical literature
indicating that his early smoking cessation would have minimized

to the point of near nonexistence any lasting negative effects from his remote history of smoking on his mortality, and the further evidence that his cancer was "no longer a factor" in his mortality risk, suggests to the court that Mr. Brown should fall somewhere between a "never" and a "former" smoker and a "yes" or "no" to the history of cancer question. These calculators do not have these options. But that does not mean that the court cannot reasonably take the circumstances into account in determining his life expectancy.

Obviously, no one can be certain how long Mr. Brown will live. The court can do no more than make its best prediction based on the evidence presented. Unfortunately, Mr. Brown's life expectancy is probably not the fourteen years of a man his age of average health. In the court's opinion, though, neither is it likely the five to six years asserted by Dr. Shavelle. Rather, having taken into account all the evidence and the parties' arguments in support of their respective positions, the court finds that his life expectancy from the time he turned 70 was more likely 10 years, making it 9.5 years at the time of trial.[8]

---

[8]     It bears noting that Mr. Brown has demonstrated a tenacity and a capacity for survival. At the time of his cancer diagnosis, the five-year survivability rate for small cell lung cancer was only 2%. Yet he survived. And in the months following the trocar injury he sustained in May 2016, hospitalists recommended hospice care for Mr. Brown three

<u>Future Needs</u>

Plaintiffs have the burden to prove their damages by a preponderance of the evidence. <u>Cade v. Walker</u>, 771 So. 2d 403, 406-07 (Miss. Ct. App. 2000) (citations omitted). "[T]o be recoverable, damages must be shown with reasonable certainty and not left to speculation and conjecture." <u>Wackenhut Corp. v. Fortune</u>, 87 So. 3d 1083, 1091 (Miss. Ct. App. 2012) (quoting <u>Flight Line, Inc. v. Tanksley</u>, 608 So.2d 1149, 1164 (Miss. 1992) (citations omitted)). This includes, of course, future damages.

The Government has offered no evidence to dispute the reasonableness of the valuation of the costs of the various items contained in Smith's life care plan.[9] It does argue, though, that plaintiffs have failed to demonstrate any reasonable medical need for many or most of the items included in the plan and that the plan thus overstates the cost of Mr. Brown's future medical needs.[10] Having considered the life care

---

separate times; and yet he survived. Following surgery by Dr. Slakey, which itself was high-risk, he survived an episode of septic shock, which is very often fatal.

[9] Smith's life care plan included options based on in-home care and facility care. The court bases its award on the in-home care option as it is clearly the more reasonable option for the Browns.

[10] The Government designated an expert life care planner, Bruce Brawner, who prepared an original and supplemental life care plan. His supplemental plan was the subject of a pretrial motion to strike by plaintiffs, which the Government opposed. The Government did not offer the testimony or report of Brawner at trial, and the court has not relied on his report. It merely notes that most of the items included in Smith's plan were also

plan and Smith's testimony relating to the plan, the court finds

that it is largely supported by the evidence presented at trial

and constitutes a reasonable assessment of his future needs.  In

the court's opinion, however, there is a lack of sufficient

credible evidence to support the medical need, or the extent of

the alleged need, for a number of the categories or items

contained in the plan.[11]

The life care plan includes costs for the services of a

case manager, including a one-time 4-hour evaluation followed by

36 to 42 hours of services per year (averaging 3 to 3.5 hours

per month) for his life expectancy.  As described by Smith, the

case manager's function would be to "assist with coordinating

included in Brawner's life care plan (although Brawner's plan in
most instances proposed that services be furnished on a more
limited/less frequent basis or at a lower cost per unit than
proposed by Smith), and that Brawner purported to rely on the
opinion of the Government's medical expert, Dr. Shannon Orr, as
establishing the medical need for all of the items included in
his plan.  The items included in Smith's plan for which
Brawner's plan made no provision were a case manager, financial
planner, speech therapy, neurotherapy/vestibular therapy,
nutrition and dietary evaluation/services, skin trauma
evaluation/treatment, adaptive clothing, humidifier, manual
resuscitation kit, various medications, housekeeping services
and annual/biannual visits with an internal medicine specialist,
neurologist, and ophthalmologist.

[11]    The fact that Dr. Rebecca Rose, Mr. Brown's primary
physician, and Dr. Jessie Penico, his infectious disease doctor,
have both reviewed Smith's plan and generally affirmed that it
accurately represents Mr. Brown's medical needs, is clearly
pertinent but not necessarily determinative.  To a certain
extent, their expressions of approval have more the feel of a
rubber stamp than a genuine assessment of Mr. Brown's medical
needs.

appointments, locating appropriate therapists, developing a long-range plan of care and supervising [Mr. Brown's] care programs and needs" so as to "allow for ongoing assessments and response to intervention and timely actions to meet changing needs" and to "serve as a liaison between the client, vendors, programs and specialists to ensure that all needs are met with a comprehensive and effective manner."  The court does find that Mr. Brown is not and will not become capable of managing his own care effectively and to his best advantage.  While Mrs. Brown, on the other hand, appears highly capable, in the court's opinion, she should not be shouldered with the sole responsibility for managing these matters.  That said, the court is not persuaded that Mr. Brown's needs are such that he requires the "moderate to high" level of case management for which Smith has purportedly provided.[12]  In the court's opinion, a 4-hour evaluation is reasonable, but thereafter, he should require no more than 1.5 hours per month for services.

The life care plan also includes the services of a financial planner based on Mrs. Brown's report that Mr. Brown was no longer handling the couple's finances.  However, Smith

---

[12]    Smith testified that she used the Case Management Support Mean Table to determine the amount of time needed.  She said she "went on the lower end" and, using a "conservative approach", determined he had a "moderate to high" rather than a "high" need of attendant care.

testified that she was not aware of any evidence that Mr. Brown was not competent to manage finances. In the court's opinion, the record evidence does not support an award for such services.

Smith claimed in her testimony that an $800 annual clothing assessment in the life care plan was based on a study by the Veterans Administration which concluded that people with disabilities spend $800 more on clothing per year than nondisabled persons. However, while the Veterans Administration does provide for a clothing allowance of $800 to veterans whose clothing is worn or damaged due to the use of prescribed skin medications or prosthetic/orthopedic devices for a service-connected disability, there has been no showing in this case that Mr. Brown's clothing was worn or damaged due to any disability. Mrs. Brown did testify that Mr. Brown has difficulty with buttons and zippers; but there is no evidence that such a limitation would result in an increase in the cost of clothing.

Included in the life care plan in the list of various medical equipment and supplies Mr. Brown is likely to need is a humidifier. The Government has questioned the necessity of this item. While a humidifier, like good nutrition, is a good idea and can be beneficial, it has not been demonstrated to be medically necessary, and its cost will not be included in the court's damages computation.

The largest expense contained in the life care plan is for attendant care by a home health aide 24 hours a day, 7 days a week.  It is undisputed that due to the extent and nature of his debility, Mr. Brown requires and will always require assistance with activities of daily living.  Moreover, particularly owing to the risk of falls, the Government does not dispute that he cannot be left alone.  Someone must be with him at all times. Based on these facts, the court does find that reasonable provision should be made for attendant care.  Of course, Mr. Brown does not live alone; he lives with his wife, who retired years ago and does not work outside the home.  The court does not doubt that Mrs. Brown would willingly sacrifice her own freedom and convenience to care for her husband, as she has done for several years now.  But "[a] life care plan should not capitalize upon the services of family members unless such services are valued." Vanhoy v. United States, No. CIV.A. 03-1090, 2006 WL 3093646, at *5 (E.D. La. Oct. 30, 2006), aff'd, 514 F.3d 447 (5th Cir. 2008).  However, in the court's opinion, plaintiffs' request for an award covering an around-the-clock attendant is not justified.  Considering all the evidence, the court finds that attendant care is reasonably required, but for 8 hours a day, rather than the 24 hours claimed by plaintiffs.

Smith asserted in her testimony at trial that she included in her life care plan a one-time evaluation followed by annual

services of a dietician/nutritionist because good nutrition is essential to maintaining good health, particularly in a person like Mr. Brown who is immunosuppressed.  In the court's opinion, a one-time evaluation by and consultation with a dietician/ nutritionist for the purpose of assessing and counseling the Browns regarding Mr. Brown's dietary and nutritional needs is probably reasonable, but in the court's opinion, plaintiffs have not demonstrated that the services of a dietician/nutritionist would be required on an ongoing basis.

Smith's life care plan provides for occupational and physical therapy and neurotherapy/vestibular at what she describes as a "maintenance" level to aid in sustaining Mr. Brown's abilities at his highest functioning level.  The Government has insinuated that such therapy cannot reasonably be found to be necessary because no physician has prescribed these. In fact, however, throughout his ordeal, and at the direction of his medical providers, Mr. Brown has undergone rigorous ongoing occupational, physical therapy and neurotherapy/vestibular when his condition allowed.  It can certainly be reasonably inferred from the medical record that Mr. Brown will require and benefit from periodic maintenance therapies.

That said, Smith's life care plan also provides for future speech therapy.  The court does understand that despite its name, "speech" therapy encompasses more than merely speaking.

However, the court is not aware of any record evidence that would reasonably demonstrate the future need for such therapy.

Smith explained at trial that she included a one-time charge for psychological counseling because if something major were to happen in the future, for example, if something were to happen to Mrs. Brown, then Mr. Brown would likely need counseling. Based on this explanation, the court finds that plaintiffs' claim for an award for psychological counseling services is not warranted as it is not shown to be proximately related to the injury that is the subject of this litigation.

The life care plan includes the projected costs of routine doctor visits and various medications. In the court's opinion, the record supports a finding that Mr. Brown has and will continue to have a need for some of the listed medications and that the need for them is causally related to the negligence and resulting injuries that are the subject of this lawsuit. However, it appears from a review of Mr. Brown's medical records, in particular those of Dr. Rose, that Mr. Brown was taken off some of these medication prior to trial, and the court is aware of no evidence to indicate that he will continue to have or will again have a need for these medications. This includes Keppra (which Smith acknowledged in her trial testimony

should be removed from the life care plan), Midodrine and an eye ointment.[13]

Included in the list of physicians that are likely to be part of Mr. Brown's future medical care routine is a cardiologist. The Government has suggested that the evidence does not support an award of damages for future cardiology visits, and indeed, Dr. Rose testified not that Mr. Brown would need regular visits with a cardiologist but that she would refer him to a cardiologist "as needed." She did not state that it would likely be needed. Accordingly, the court declines to include these costs in its damages award.[14]

For each item listed in the life care plan, Smith provided a cost range from low to high. For all items for which there

---

[13]    Mr. Brown had previously been prescribed artificial tears as well as an eye ointment to treat a severe eye infection. The court has heretofore found that as a proximate result of the injuries he sustained as a result of Dr. Barchie's negligence, Mr. Brown is immunosuppressed and thus particularly susceptible to infection. The medical evidence indicates that Mr. Brown suffers from severe dry eyes, which causes discomfort and increased risk of infection, necessitating the regular use of artificial tears, which are prescribed by his ophthalmologist. His use of the artificial tears has been ongoing, but it appears the eye ointment he was previously prescribed was discontinued.

[14]    The life care plan also provides for routine visits with Mr. Brown's infectious disease doctor (Dr. Penico); his internal medicine physician (Dr. Rose); his ophthalmologist (see *supra* note 10); and a neurologist (Dr. Mishra). The court is aware that Mr. Brown received treatment from a neurologist prior to the incident at issue in this case. However, the court is also of the opinion, as previously expressed, that his neurological issues were exacerbated by the May 2016 injury and its sequela.

was a CPT code -- which is the vast majority of items -- she based the cost range on the applicable Medicare-allowable rates, setting the low end at 50% of the Medicare-allowable and the high end at 90%.  Smith testified that the cost typically should be neither at the low nor high end but "right in the middle." For items not covered by Medicare, she developed a cost range from information obtained from contacting a number of service providers.  The Government has offered no evidence in opposition.

As suggested by Smith, the court, in assessing values for the various items in the several categories of future damages, the court has used a middle, rather than the high or low figures indicated by Smith, by averaging the two.  In so doing, the court has arrived at an undiscounted future damages amount of $1,078,082.53, which includes $815,872.61 for medical care and services, including attendant care, doctor visits, and physical and occupational therapy and neurotherapy/vestibular; $25,581.29 for medicines; $172,164.04 for medical commodities and supplies, including, *inter alia*, a wheelchair and accessories and ramps, bed, walker, shower chair, chair lift, commode, urinal, TED stockings, therapy mat and manual resuscitation kit; and lastly, nonmedical or general commodities and services, including, *inter alia*, case manager services, handyman and housekeeping services, equipment maintenance, home assessment, home renovations, home

security system with emergency call alert system, and wellness center membership.

<u>Reduction to Present Value</u>:

The general rule is that an award for future damages must be reduced to its present value; "present value" is the current worth of a certain sum of money due on a specified future date after taking interest and inflation into consideration. George Carter, plaintiffs' expert economist, used a below market discount rate procedure for discounting Mr. Brown's future economic damages, applying the 10-year interest rate on government bonds of 6.48%, offset by the estimated rates of future price inflation on various categories of claimed damages, to arrive at the applicable discount rates. Carter testified that discount rates for medical care commodities, medical care services, and general commodities and services were 1.66%, .62% and 2.78%, respectively. The Government has not challenged the methodology or rates cited by Carter. Accordingly, the total anticipated cost of Mr. Brown's future medical needs, as set forth *supra*, discounted to present value, is $ 1,068,215.48.

<u>Tri-Care for Life and the Collateral Source Rule</u>

"In Mississippi, the collateral-source rule states that '[c]ompensation or indemnity for the loss received by plaintiff from a collateral source, wholly independent of the wrongdoer, as from insurance, cannot be set up by the [defendant] in

mitigation or reduction of damages.'" <u>Brooks v. Purvis</u>, 70 So.
3d 1166, 1172 (Miss. Ct. App. 2011) (quoting <u>Coker v. Five-Two</u>
<u>Taxi Serv.</u>, 52 So. 2d 356, 357 (Miss. 1951)). <u>See also</u> <u>Loyacono</u>
<u>v. Travelers Ins. Co.</u>, 163 So. 3d 932, 937 (Miss. 2014) ("[T]he
collateral-source rule precludes the presentation of evidence
that a plaintiff has been compensated for [his] injury from some
other source, such as payment from an insurance policy."). The
primary purpose of the collateral source rule is to prevent the
defendant wrongdoer from benefiting or getting credit for
compensation that comes to the plaintiff from a "collateral
source". <u>Chickaway v. United States</u>, No. 4:11-CV-00022-CWR,
2012 WL 3236518, at *1 n.5 (S.D. Miss. Aug. 7, 2012) (citing
<u>Harper, James and Gray on Torts</u> § 25.22 (3d ed. 2007)).

Tricare is the government health care system that provides
benefits to dependents of active duty service members as well as
retired service members and their dependents. <u>See</u> 32 C.F.R.
§ 199.17. The Government asserts that the "vast majority of
[Mr. Brown's past] medical expenses were paid for by TRICARE";
and it contends that most of the future expenses claimed by
plaintiffs, as set forth in Smith's life care plan, are covered
by Tricare.[15] The Government argues that since Tricare is funded

---

[15]    According to government witness Valerie Palmer, a Tricare
representative, of the items in Smith's life care plan, Tricare
covers all but the following:  home renovations, a home security
system, wellness center membership, AAA membership, handyman

from the federal treasury, as will be any judgment plaintiffs obtain herein, then amounts paid or payable under Tricare are not collateral source payments and therefore should be deducted from any recovery by plaintiffs.  According to the Government, therefore, it is entitled to an offset against the $2,082,592.10 plaintiffs claim in past medical expenses by the amount covered and paid by Tricare, and further that any award for future medical expenses, to the extent the court has found them medically necessary and proximately caused by Dr. Barchie's negligence, should be limited to out-of-pocket expenses for which Tricare provides no coverage.

Plaintiffs acknowledge, as the undersigned previously noted, that "'[t]he vast majority of courts to consider this issue ... have concluded that (where the United States is the tortfeasor) TriCare/CHAMPUS benefits are not a collateral source, holding that they are benefits derived from general revenues of the United States.'"  Brown v. United States, No. 3:17CV551TSL-RHW, 2019 WL 6330645, at *1 (S.D. Miss. Nov. 26, 2019) (parenthetical added) (quoting Murphy v. United States, No. CIV. 06-00304 BMK, 2009 WL 454627, at *6 (D. Haw. Feb. 23, 2009)).  Both parties have cited a number of such cases in their briefs.  See, e.g., Austin v. United States, No. 16-CV-02756-

services, certain incontinence and skin care items and certain wheelchair accessories.

KLM, 2018 WL 6168064, at *6 (D. Colo. Nov. 26, 2018), amended, No. 16-CV-02756-KLM, 2019 WL 1785472 (D. Colo. Apr. 24, 2019) ("TRICARE is not a source collateral to the United States in this FTCA case"); Williamson v. United States, 5:12-CV-334-JMH-REW, 2015 WL 3734153, at *2 (W.D. Ky. June 15, 2015) (since both Tricare benefits and any FTCA damages would come from the government's general unfunded treasury, Tricare was not "wholly independent" of the United States and collateral source rule did not apply); Harvey v. United States, No. 3:09CV122-S, 2013 WL 2898785, at *1 (W.D. Ky. June 13, 2013) (Tricare payments which have already been made for the plaintiff's benefit are not collateral payments as to the United States in FTCA case); Murphy v. United States, No. 06-00304 BMK, 2009 WL 454627, at *6 (D. Haw. Feb. 23, 2009) ("Absent a showing that the TriCare payments come from a special fund that is separate and distinct from general government revenues," the United States was entitled to an offset for TRICARE payments because such payments were not collateral to the United States).

Plaintiffs point out, however, that each of the cited cases involved traditional Tricare programs such as Tricare Prime, in which Tricare is the primary payor.  Mr. Brown's Tricare plan, called Tricare for Life, is different.  Tricare for Life is Medicare-wraparound coverage for Tricare-eligible beneficiaries who have Medicare Parts A and B.  Under Tricare for Life

coverage, Medicare typically serves as the primary payer and Tricare as secondary payer, reimbursing only those portions of a claim that are not covered by Medicare.[16]

A person becomes covered under Medicare Part A when he turns 65, or sooner, if he is disabled. Medicare Part A generally covers hospitalization, skilled nursing facility care, hospice care, and some home health care. Medicare Part B is separate coverage for other medical expenses, such as doctors' visits, outpatient care, medical supplies, and preventive services. Unlike coverage under Medicare Part A, which has no associated costs, coverage under Medicare Part B requires payment of an enrollment fee and the payment of monthly premiums thereafter.

Active and retired members of the military are automatically covered by Tricare Prime until such time as they become eligible for Medicare, due either to age or disability. Once they become Medicare-eligible, they are no longer covered by Tricare Prime, but by enrolling in Medicare Part B as soon as they become eligible to do so, they are automatically enrolled

---

[16]     Tricare is administered through the Department of Defense. Its Tricare website, https://tricare.mil, undertakes to provide information regarding the various Tricare programs and benefits, including how Tricare for Life works in conjunction with Medicare. According to the website, "[u]nderstanding how Medicare and TRICARE work together and when to buy Part B can be confusing."

in Tricare for Life.  There is no enrollment fee for Tricare for

Life coverage and there are no monthly premiums.

Mr. Brown has been covered by Medicare Part A and Part B

since 2005, when he was found disabled due to cancer.  Since

that time, he has had Tricare for Life coverage, which since his

injury in May 2016, has paid portions of his medical expenses,

secondary to Medicare payments.  Plaintiffs do not dispute that

the source of funding for these Tricare for Life payments and

the source of funding for the judgment they will recover in this

case is the same, i.e., the general federal treasury.

Nevertheless, they contend that because Mr. Brown was required

to purchase Medicare Part B coverage and pay premiums in order

to be entitled to Tricare for Life Medicare supplement

insurance, he effectively purchased his Tricare for Life

coverage, albeit indirectly, and the court should thus find that

Tricare for Life is a collateral source.  In the court's

opinion, however, Mr. Brown cannot reasonably be considered to

have purchased Tricare for Life coverage merely because his

*eligibility* for automatic, cost-free enrollment for this

coverage was conditioned on his having Medicare Part B coverage,

for which payment was required.  The court, therefore, concludes

that the Government is entitled to an offset against plaintiffs'

award of economic damages for the $152,793 in Tricare benefits

that were paid on his behalf from the date of his May 9, 2016

injury.[17]

The court is of the opinion, however, as contended by

plaintiffs, that future Tricare benefits are too speculative to

provide the basis for any reduction of or offset against future

medical expenses.  In this regard, plaintiffs submit that the

speculative nature of the Tricare program itself precludes any

offset.  As a statutory entitlement program, they note, the

---

[17]    Contrary to the Government's assertion, Tricare clearly did
not pay the "vast majority" of Mr. Brown's past medical
expenses.  Pursuant to agreements between Mr. Brown's medical
providers and Medicare (not Tricare, but Medicare), the majority
of the $2,082,592.10 billed for Mr. Brown's medical care was
written off.  Of the remaining balance, Medicare, as primary
payor, paid $182,336.  Tricare, as secondary payor, paid
$152,793.
        Mississippi law is clear, and the government concedes, that
the amount paid by Medicare is a collateral source, for which
the Government is not entitled to an offset.  See Wal-Mart
Stores, Inc. v. Frierson, 818 So. 2d 1135 (Miss. 2002)
(collateral source rule applies to Medicare payments for
patient's medical expenses).  Mississippi law is likewise also
clear that an amount written off pursuant to a provider's
agreements with Medicare is a collateral source, not to be set
off against plaintiffs' damages award.  See Id.; see also
Rodriguez v. GPI MS-N, Inc., No. 1:15CV255-RHW, 2017 WL 2835749,
at *1 (S.D. Miss. June 1, 2017) ("Several courts within this
district have held that the collateral source rule encompasses
gratuitous medical care, expenses written off by medical care
providers, and adjustments to medical bills.") (citing federal
district court and Mississippi Supreme Court cases); Robert A.
Weems & Robert M. Weems, Mississippi Law of Torts § 18.7
(November 2011) (Mississippi's collateral source rule "permit[s]
plaintiff to include in his proof of medical expenses the
portion of those expenses that were 'written off' by medical
providers pursuant to Medicare and Medicaid regulations.")
(cited in Chickaway v. United States, No. 4:11-CV-00022-CWR,
2012 WL 3236518, at *1 n.5 (S.D. Miss. Aug. 7, 2012)).

program is subject to being modified or even eliminated by Congress at any time.  Indeed, there is no guarantee that the program will continue to exist, or that it will continue to exist in its current form, for the remainder of Mr. Brown's life expectancy.[18]  The court's larger concern, though, is its inability to reasonably predict whether, and if so in what amounts, Tricare is likely to pay for what the court has determined to be Mr. Brown's likely future medical expenses as a result of the injury he sustained.  Far too many variables are involved.  As plaintiffs explain in detail in their supplemental brief, Tricare for Life, being Medicare wrap-around coverage, cannot exist or provide benefits independent of Medicare.  The Medicare program is a complex system in itself in which coverage and amounts payable or ultimately paid depend on numerous factors, including but not limited to, the type of service provided; whether it is provided by a Medicare provider or an opt-out provider; and whether the provider has an assignment agreement with Medicare.  Likewise, the amount that  Tricare for Life pays in supplement of Medicare's primary payment depends on these and additional factors specific to Tricare for Life coverage, such as whether the service or item is covered by

---

[18]    The government points out this is highly unlikely, as Tricare/CHAMPUS has been in existence since 1966.  Tricare for Life, however, was first added as a benefit in 2001.

Tricare for Life, how much Medicare paid, if any, and whether the provider is a participating or nonparticipating hospital.

At trial, the Government presented the testimony of Valerie Palmer, a Tricare representative, who gave some very general, and generally unhelpful testimony about the coverage provided under the Tricare for Life program.  Counsel for the Government walked Palmer through Smith's life care plan and had her state whether Tricare for Life provided coverage for each type of service or item.  To most items, she responded that coverage was, in fact, available.  But she offered no information, and certainly no specific information about how Mr. Brown's Tricare for Life worked in conjunction with his Medicare coverage, or as to any of the variables affecting coverage or amounts payable, or ultimately, as to any amount that Tricare might reasonably be expected to pay on any of Mr. Brown's future medical expenses.

The Government, having requested an offset or credit for future Tricare payments, has the burden to prove that this relief is warranted.  See Smith v. Union Nat'l Life Ins. Co., No. 1-15-CV-9-KS-RHW, 2018 WL 1021342, at *11 (S.D. Miss. Feb. 22, 2018) (defendant had burden of proof for affirmative defense of setoff); Universal Computer Servs., Inc. v. Lyall, 464 So. 2d 69, 76 (Miss. 1985) (rejecting argument that appellant was not required to provide additional evidentiary support on its

affirmative defense of setoff and affirming denial of setoff for lack of evidence).

Government's Request for a Reversionary Trust

In response to plaintiffs' posttrial memorandum as to the effect of Tricare for Life payments on any award for future medical expenses, the Government asserted, for the first time, that in order to ensure that the United States does not pay twice for Mr. Brown's future medical care, and as a way to effectively resolve any uncertainties as to Mr. Brown's actual future medical needs and as to what Tricare will actually cover and how much it will actually pay (as well as to deal with any uncertainties as to his life expectancy), the court should establish a reversionary medical care trust that will pay Mr. Brown's future medical care expenses, as determined by the court, with any funds remaining upon Mr. Brown's death reverting to the United States Treasury.  Plaintiffs responded in opposition to this request.[19]  Under clear Fifth Circuit

---

[19]    Plaintiffs filed a rebuttal brief directed solely to the issue of the government's request for the establishment of a reversionary trust.  The government has moved to strike plaintiffs' rebuttal on the bases that it was filed in contravention of the court's order directing briefing on the Tricare issue (which did not provide for any rebuttal submission) and in violation of Uniform Local Rule 7(b)(5)'s 35-page limit (since plaintiffs exhausted their page limit with their opening brief).  Plaintiffs have responded in opposition, aptly pointing out that their rebuttal was necessary in light of the Government's having raised in its response brief an entirely new argument which they were compelled to address.  Additionally

authority, the Government's request is not well-taken and will be denied.

The Fifth Circuit in <u>Vanhoy v. United States</u>, 514 F.3d 447 (5th Cir. 2008), an FTCA case, rejected a similar request by the Government that the court's future damages award take the form of a reversionary trust.  The Fifth Circuit chose to follow the reasoning of the Third Circuit in <u>Frankel v. Heym</u>, 466 F.2d 1226 (3d Cir. 1972), where the court, in also refusing such a request, stated:

> We agree with the district court that in administering the legislation in question a district court should not make other than lump-sum money judgments unless and until Congress shall authorize a different type of award.  The relaxation of sovereign immunity is peculiarly a matter of legislative concern, responsibility and policy.  If novel types of awards are to be permitted against the government, Congress should affirmatively authorize them.

<u>Vanhoy</u>, 514 F.3d at 454 (quoting <u>Frankel</u>, 466 F.2d at 1228-29).[20]

The court in <u>Vanhoy</u> also cited with approval the Fourth

---

and/or alternatively, plaintiffs have moved for leave to file their rebuttal brief.

When asserting in its Tricare brief the request for a reversionary trust, the Government clearly anticipated that plaintiffs would file or seek leave to file a rebuttal, and argued against them being allowed to do so.  But the Government cannot reasonably expect to be permitted to raise such an issue for the first time at this late stage of the litigation without plaintiffs being given an opportunity to respond.  Plaintiffs' request for leave to file their rebuttal will therefore be granted and the Government's motion to strike denied.

[20] The Government argued in <u>Vanhoy</u> that for the United States was treated "in the same manner and to the same extent as" a private health care provider, as required by 28 U.S.C. § 2674 of

Circuit's holding in <u>Reilly v. United States</u>, 863 F.2d 149 (1st Cir. 1988), another FTCA case, that "[w]hen a tortfeasor loses at trial, then—absent a statute or the parties' contrary agreement ... —it must pay the judgment in one fell swoop." <u>Id</u>. (quoting <u>Reilly</u>, 863 F.2d at 170). The Fifth Circuit concluded that, "[l]ike the First and Third Circuits before us, we refuse to deviate from a conventional lump-sum award by insisting that, absent particular circumstances … the district court create a reversionary trust—at least not until or unless Congress expressly authorizes such an arrangement." <u>Id.</u> at 455. The "particular circumstances" that could support a contrary result, the court noted, included a controlling statute, agreement of the parties, or where a "trust, annuity, or other prophylactic arrangement is necessary to ensure that the injured party will in fact receive his due". <u>Id</u>. at 455 n.34 (quoting <u>Reilly</u>, 863 F.2d at 169 n.16).

_____

the FTCA, the court should create a reversionary trust, since that would most closely approximate the treatment of future medical expenses under Louisiana law, which, by statute, provides that awards for future medical expenses in medical malpractice actions are payable, not by the negligent health care provider, but from a Patients' Compensation Fund, as such charges accrue, with payment ceasing upon the victim's death. <u>Vanhoy v. United States</u>, 514 F.3d 447, 449 (5th Cir. 2008). The court rejected this position.

    As plaintiffs point out, Mississippi substantive law does not provide for payment of future medical expenses other than by a lump-sum.

The Fifth Circuit added that its "unwillingness to fashion a remedy in the absence of any statutory or precedential requirement is bolstered by consideration for the district court and the burden it would face" were it required to create a reversionary trust."  Id.

> The district court would be forced to assume a substantial amount of responsibility, as well as an administrative role in the medical malpractice scheme….  The court would be confronted with a plethora of decisions relating to the creation and operation of the trust, including, but not limited to: Who should be appointed trustee?  What are the terms and conditions of the trust?  How should the corpus be invested?  What are the terms and conditions for covered services?  How are claims to be submitted?  Who is responsible for reviewing them, proving them, and paying them?  In addition to these initial decisions, the district court would bear the continuing burden of supervision for the indeterminate life of the trust.  Absent express statutory authorization for the creation of a reversionary trust … we will not require a district court to practice trust and estate law.

Id.  Congress has not expressly authorized the creation of a reversionary or other trust arrangement for FTCA damages awards, and there are no particular circumstances in this case that would arguably warrant departure from the requirement that damages be awarded and payable as a lump-sum.

Conclusion

Based on all of the foregoing, the court finds and concludes that plaintiffs' economic damages, past and future, are in the total sum of $3,263,927.58, against which the

Government is entitled to an offset in the amount of $152,793.00, so that plaintiffs are entitled to recover in this cause, economic damages of $3,111,134.59.

A separate judgment will be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 13th day of May, 2020.


/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE